# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| HAROLD D. WILLIAMS,<br><br>                Plaintiff,<br>vs.<br><br>MARY BENSON, STEPHEN VEIT and BRAD WITTROCK,<br><br>                Defendants. | No. C15-4035-LTS<br>No. C15-4043-LTS<br><br>**MEMORANDUM**<br>**OPINION AND ORDER** |

_____

## I.   INTRODUCTION

These consolidated cases are before me on defendants' motion (Doc. No. 16)[1] for summary judgment. Plaintiff has filed a resistance (Doc. No. 23) and defendants have filed a reply (Doc. No. 25). No party has requested oral argument and, in any event, I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c). Therefore, the motion is deemed fully submitted on the parties' written submissions.

## II.   PROCEDURAL HISTORY

Plaintiff Harold Williams filed a motion (Doc. No. 1) for leave to proceed *in forma pauperis* and a proposed *pro se* complaint on April 29, 2015. In that complaint, Williams alleged a violation of his constitutional right to receive adequate medical care. The Honorable Donald E. O'Brien, Senior United States District Judge, conducted an initial review (Doc. No. 2) and allowed Williams' pro se complaint (Doc. No. 3) to be filed on May 13, 2015. Judge O'Brien also appointed counsel for Williams. Doc. No. 2.

---

[1] Unless otherwise noted, all docket references are to the docket in No. C15-4035.

On June 3, 2015, Williams sought leave to file a second action by filing a motion (C15-4043-DEO, Doc. No. 1) to proceed *in forma pauperis* with another *pro se* complaint. In the second complaint, Williams alleged a violation of his First and Fourteenth Amendment rights to access mail and telephone communications. Judge O'Brien entered a second initial review (Doc. No. 7) on June 11, 2015. Judge O'Brien consolidated the second case (C15-4043-DEO) with the above-captioned case and indicated that the same attorney (Hannah Vellinga) appointed for Williams in the first case should represent him with regard to all claims presented in the consolidated cases. Doc. No. 7 at 12-13. He directed Ms. Vellinga to file a combined amended complaint incorporating all of Williams' legally-viable claims in both cases. *Id*. at 13.

Ms. Vellinga filed the amended complaint (Doc. No. 10) on July 27, 2015. That complaint asserts constitutional violations arising from allegations of (a) the denial of adequate medical care and (b) overly-restrictive mail and telephone policies. On August 17, 2015, defendants filed an answer (Doc. No. 11) denying Williams' claims. Defendants then filed their motion for summary judgment (Doc. No. 16) on January 14, 2016.

### III.     RELEVANT FACTUAL BACKGROUND

Based on the parties' filings, and except as otherwise noted, the following facts appear to be undisputed for purposes of defendants' motion:

*A.     The Parties*

Williams is a patient at the Civil Commitment Unit for Sexual Offenders (CCUSO), in Cherokee, IA, having arrived December 6, 1999. Doc. No. 16-3 at 3. Defendant Mary Benson is an advanced registered nurse practitioner (ARNP) at CCUSO who provides medical care to patients. Doc. No. 16-4 at 1. Benson is the highest ranking medical official who works full-time at CCUSO. Defendant Stephen Veit is a contract

physician who provides medical care to patients at CCUSO. Doc. No. 16-3 at 105. Dr. Veit also maintains a separate private practice. *Id.* Defendant Brad Wittrock is the Director of Security and Deputy Superintendent of CCUSO. Doc. No. 16-4 at 62.

### B.  *The Medical Claim*

Williams alleges that the defendants have been deliberately indifferent in the treatment of his shoulder. His first documented complaint of shoulder pain was in November 2006. *Id.* at 26. His next documented complaint was on February 13, 2009, when he requested a cortisone injection in his left shoulder. *Id.* at 25. On February 18, 2009, Williams received an injection from Dr. Veit (records indicate the injection was in the right shoulder but Williams contends that this is an error and it was actually the left shoulder). *Id.* at 25, 83. Williams received another cortisone injection in the shoulder on October 28, 2009 (again records indicate the injection was in the right shoulder but Williams contends this is an error and the injection was in the left shoulder). *Id.* at 24.

On January 19, 2010, Williams complained of pain behind the left shoulder blade. *Id.* At that time, Williams requested an x-ray of his shoulder and chest. *Id.* The x-ray was arranged and completed by the University of Iowa Hospitals and Clinics (UIHC) on February 23, 2010. Doc. No. 23-4 at 11. The x-ray showed degenerative changes at the acromioclavicular joint. *Id.*

Williams contends that he complained about his left shoulder continuously, but there is no evidence in the record of any complaints made between February 2010 and December 2013. During that period, Williams complained about and received treatment for; diabetes, abdominal pain, chest pain, incontinence, colds, psoriasis, dental pain, difficulty swallowing and elbow pain. Doc. No. 16-4 at 11-23. He also had numerous visits with Benson, Dr. Veit and various UIHC specialists, including gastrointestinal, urology, ear nose and throat and otolaryngology. *Id.* at 2.

3

On December 27, 2013, Williams requested a cortisone shot for his left shoulder from Dr. Veit but was informed that he would have to wait to see Dr. Veit until after the holidays. *Id*. at 11. At that time, Williams was willing to try Naproxen for pain relief. *Id*. On January 3, 2014, Williams again requested an injection and was informed that CCUSO would try to contact Dr. Veit. *Id*. On January 14, 2014, Williams inquired as to any response from Dr. Veit and was informed by Benson that CCUSO had not yet heard back. *Id*. at 10. On January 21, 2014, Williams again inquired about receiving an injection. *Id*. On March 19, 2014, Williams received an injection in his left shoulder from Dr. Veit. *Id*. at 9.

On July 1, 2014, Williams went to Dr. Archer, a physician in Storm Lake, Iowa, to have his shoulder evaluated. *Id*. at 67. Williams was sent to Dr. Archer by a former employer for a pre-employment physical. Doc. No. 16-3 at 23. Williams requested that Dr. Archer be his personal physician when he is released from CCUSO. *Id*. At this appointment, Williams received another cortisone injection in the left shoulder and was told to follow up in three months to determine if there was any relief from the injection. Doc. No. 16-4 at 80. On October 28, 2014, Williams had a follow up appointment with Dr. Archer who, due to Williams' complaint of no relief from the cortisone injection, recommended an MRI. *Id*. The MRI was done October 31, 2014, and indicated a small partial articular side tear in the rotator cuff. *Id*. at 119.

On November 25, 2014, Williams wrote a letter to Benson requesting an answer about being seen in Iowa City regarding his shoulder. Doc. No. 23-4 at 13. Benson replied on December 1, 2014, asking Williams to come see her to clarify what he wanted done. *Id*. December 1, 2014, Williams wrote again to Benson seeking action regarding his left shoulder. Doc. No. 16-4 at 68. Benson replied on December 10, 2014, asking that documentation from Dr. Archer be provided to either CCUSO or directly to UIHC, in order to process a referral. *Id*.

4

Williams testified that in December 2014, he lifted a heavy gearbox over his head. Doc. No. 16-3 at 37-39. He testified that "my shoulder was shot at that point" and that he "wasn't able to lift much after that." *Id.* at 38-39. On December 29, 2014, Williams had a consult at UIHC with Dr. Bollier, an orthopedic surgeon. Doc. No. 16-4 at 31. Upon reviewing an MRI, Dr. Bollier noted a high-grade partial-thickness tear in the rotator cuff. *Id.* at 33. Williams elected to have surgery after consulting with Dr. Bollier and being provided with multiple treatment options. *Id.* at 34.

The surgery was performed on January 21, 2015, at UIHC. *Id.* at 36. During surgery, Dr. Bollier noted a near full thickness supraspinatus tear of the rotator cuff and an upper border full thickness tear of the subscapularis tendon. *Id.* at 44. Following surgery, post-operative instructions were given to CCUSO medical staff and copies were provided to Williams. Doc. No. 23-4 at 5. Williams was to wear a sling for six weeks, start physical therapy in four weeks and return for a follow up in two weeks. Doc. No. 16-4 at 46. Benson initialed the post-operative instructions document on January 26, 2015. *Id.*

Although physical therapy was not prescribed to begin until four weeks after surgery, CCUSO sent Williams to physical therapy multiple times between January 28, 2015, and February 4, 2015. *Id.* at 2, 47, 50. Meanwhile, Benson noted that Williams was not wearing the provided sling at all times post-surgery. Doc. No. 16-4 at 48. On February 6, 2015, Williams had a follow-up appointment with UIHC, where he was instructed to wear the provided sling and not to begin physical therapy for four weeks. *Id.* at 49.

On March 5, 2015, Williams had a second post-operative follow-up with UIHC and was ordered to do physical therapy three times a week for eight weeks. *Id.* at 53. Williams was not able to attend physical therapy between March 9, 2015, and April 21, 2015, due to being incarcerated for unrelated reasons. *Id.* at 2. Williams then attended physical therapy two to three times weekly from May 1, 2015, through July 7, 2015. *Id.*

5

On October 1, 2015, Williams complained again of left shoulder pain. *Id*. at 5. On October 16, 2015, Williams was seen at UIHC and received an injection in the left shoulder for inflammation. *Id*. at 60. At that time, UIHC reported no sign that the repair to Williams shoulder had failed. *Id*. at 54.

## C. *The Mail and Telephone Claim*

Williams was a class member in a previously-litigated case (C05-4065-DEO) that dealt with mail access at CCUSO. Doc. No. 16-4 at 104. An amended settlement agreement was approved by Judge O'Brien in that case on April 25, 2012. *Id*. at 109. The agreement includes the following provision:

> [if] mail is rejected in accordance with CCUSO's policy, the recipient and sender will receive notice of mail rejection. Either the recipient or the sender may appeal the rejection by completing a grievance and submitting to Dr. Smith in accordance with CCUSO policies.

*Id*. at 115.

> CCUSO's mail policy states:
>
> Patients having mail privileges and communication with the community require an assessment and evaluation of the risk and benefit for the patient, as well as, the community. CCUSO is a secure treatment facility thus both security and a therapeutic treatment environment must be considered whenever a person interfaces with the community. All incoming and outgoing mail (not including legal mail) may be reviewed and searched at the discretion of the facility as outlined in this policy.

*Id*. at 64. CCUSO's telephone policy states:

> Patients are not permitted to call their previous victims, the family members of those victims, intended victims, or any individual or business that is considered counter-therapeutic or individuals who have requested not to receive calls from the patients. . . . Patients may be approved to have telephone communication with sex offenders or felons on a case by case basis, if approved by the treatment team.

6

*Id.* at 63. Each patient must submit written requests for individuals to be placed on that patient's approved calling list. Doc. No. 16-3 at 98-100. The applicable form requires the patient to provide the following information about each individual: name, address, relationship to the patient, phone number, how the person is a part of the patient's life and if the person is a registered sex offender, felon or victim. Doc. No. 16-4 at 76. Each request is then vetted by the patient's therapist and/or treatment team to ensure appropriateness. Doc. No. 16-3 at 99-100.

Williams complains that he was denied the ability to call former CCUSO patients Ed Briggs, Mark Etie and Ryan Hoffert. Doc. No. 16-3 at 53, 55. He alleges that no reason was provided for these denials. *Id.* at 55. He also contends that he was denied the ability to call former patient Clyde Hollins on grounds that such contact would be counter-therapeutic. *Id.* at 57. Finally, Williams contends that in July 2015 he was denied the opportunity to call a family member, Aunt Paulette, while his mother was ill, because Paulette was not on his approved phone list. Doc. No. 16-4 at 70-71. Williams was allowed to call Paulette on July 25, 2015, after completing the necessary administrative steps to obtain approval. *Id.*

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical"

under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences

8

that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V. ANALYSIS

Defendants argue: (a) that they were not deliberately indifferent to a serious medical need, (b) that the mail and phone policies at CCUSO are constitutional and (c) that they are entitled to qualified immunity and Eleventh Amendment immunity.

### A. *The Medical Claim*

#### 1. *Applicable Standards*

"Where a [civilly committed] patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment." *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014); s*ee also Curtiss v. Benson*, 583 F. App'x 598 (8th Cir. 2014). Thus the Constitution, through the Fourteenth Amendment, prohibits deliberate indifference to the serious medical need of a civil detainee in the same way the Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). It is irrelevant whether such violations occur through the actions of prison doctors or prison guards, or through the intentional denial of, intentional interference with, or delayed access to medical care. *Id.* at 104-05.

To establish an official's deliberate indifference to a serious medical need, a plaintiff must demonstrate: (1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk. *Robinson v. Hager*, 292

F.3d 560, 563-64 (8th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To establish such a violation, a plaintiff must demonstrate both an objective and subjective component. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citing *Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993) ("[t]o prevail on an Eighth Amendment claim, an inmate must show both an objective element, that the deprivation was sufficiently serious, and a subjective element, that the defendant acted with a sufficiently culpable state of mind.")); *see also Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).

An imperative prerequisite to success on this claim is that the officials "knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). This showing requires a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). The result of that requirement is the necessary implication that negligent failure to diagnose and negligent treatment are insufficient to support a claim under the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06; *Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993); *see also Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").

### 2. *Discussion*

Williams alleges that Benson and Dr. Veit were deliberately indifferent to his serious medical need by neglecting to provide adequate medical care, such as (a) not providing treatment beyond cortisone injections, (b) delaying access to an MRI and eventual surgery to repair a torn rotator cuff and (c) beginning physical therapy too soon after surgery.

### a. Did Williams have an objectively serious medical need?

The first step in considering a claim of deliberate indifference is establishing whether the patient has a serious medical need. To establish a serious medical need the patient must exhibit a medical issue that (a) had "been diagnosed by a physician as requiring treatment" or (b) was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). The parties do not dispute that Williams' shoulder injury is a serious medical need. Moreover, there is sufficient evidence that Williams' complaints were diagnosed by a physician as requiring treatment. Specifically, as set out above, Dr. Veit injected William's shoulder with cortisone and Williams was referred to UIHC for additional treatment. Accordingly, the record supports a finding that Williams had a serious medical need.

### b. Were defendants deliberately indifferent?

While Williams' brief is less than clear on this issue, it appears his main arguments as to deliberate indifference are based on (a) an alleged delay in treatment and (b) the premature commencement of physical therapy after surgery. At the outset, a claim of deliberate indifference is precluded if the record does not contain any verifying medical evidence that an alleged delay resulted in a detrimental effect. *Coleman*, 114 F.3d at 785 (citing *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). Inmates who "alleg[e] a delay in treatment must present verifying medical evidence that the prison official ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotation marks omitted).

*Mary Benson.* Williams alleges Benson was deliberately indifferent by providing inadequate medical care. Specifically, he contends that Benson delayed contacting Dr. Veit, did not proscribe anything beyond Naproxen for pain, did not arrange for an MRI

11

and sent Williams to physical therapy too soon after surgery. Williams' first complaint about his shoulder within the relevant time period was on December 27, 2013.[2] Benson took action at the time of that complaint, recommending Naproxen for pain relief. After four complaints about pain in his shoulder and requests for injections, Benson arranged to have Dr. Veit provide an injection on March 19, 2014. Any delay in contacting Dr. Veit for an injection in early 2014 is not actionable, as there is no verifying medical evidence that this delay resulted in a detrimental effect. *Coleman*, 114 F.3d at 785. Without verifying medical evidence or proof that Benson ignored an acute or escalating situation, there is no constitutional violation.

Nor is there medical evidence that the treatment provided by Benson (Naproxen followed by a referral to Dr. Veit) was negligent. Even if it was, mere negligence is not actionable. *See Estelle*, 429 U.S. at 105-06. Williams can succeed on a claim against Benson only if the record contains evidence that Benson's care "so deviated from professional standards that it amounted to deliberate indifference in violation of [the][E]ighth [A]mendment right to be free from cruel and unusual punishment." *Dunlay v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). There is no such evidence in this case.

Additionally, a patient's "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Thus, Williams' disagreement with Benson's treatment decisions does not create a constitutional violation.

---

[2] Defendants contend that the only events relevant to Williams' deliberate indifference claim are those that occurred within two years of the filing of the complaint. Doc. No. 16-2 at 6. Williams did not address this issue in his brief. Doc. No. 23-3. Because 42 U.S.C. § 1983 does not contain a statute of limitations, the limitations period is borrowed from the personal injury statute of the state in which the claim arose. *See, e.g., Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992). Iowa's general statute of limitations for personal injury actions is two years. Iowa Code § 614.1(2). Because Williams' deliberate indifference complaint was filed May 13, 2015, I will consider only those events that occurred after May 13, 2013.

Finally, while it is unfortunate that CCUSO sent Williams to physical therapy too soon after surgery, there is no evidence that Benson is the CCUSO employee who scheduled the appointments. She has testified that she did not do so. Doc. No. 16-3 at 118. Williams alleges that Benson is nonetheless responsible because she supervised CCUSO's medical staff. However, "Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). A superior is responsible for a subordinate's violation only if the supervisor "directly participated in the constitutional violation" or the supervisor's "failure to train or supervise the offending actor caused the deprivation." *Id.* There is no evidence that Benson directly participated in scheduling the physical therapy or that her failure to train or supervise subordinates caused the improper appointment to be made. Moreover, there is no evidence that would raise this error to the level of a constitutional deprivation. The record contains no indication that it occurred due to anything other than inadvertence (*i.e.*, negligence) and no evidence that it actually impacted Williams' condition. Thus, the fact that Williams was scheduled for physical therapy prematurely does not support a deliberate indifference claim against Benson.

*Dr. Veit.* Williams' brief makes no argument as to how Dr. Veit was deliberately indifferent to his serious medical needs. Indeed, the only mention of Dr. Veit in the deliberate indifference section of the brief is in the following sentence: "Defendants Benson and Veit were aware of Plaintiff's complaints and provided various treatments over the years as Plaintiff's complaints escalated and even recommended looking into the possibility of a torn rotator cuff in 2009." Doc. No. 23-3 at 5. The remainder of the argument focuses entirely on Benson. *Id.* at 5-6. It is not the court's role to imagine a party's possible arguments on that party's behalf. If Williams believes a good faith argument exists that Dr. Veit violated his constitutional rights, he should have described that argument in his brief.

Based on my own review of the record, I find no basis for such an argument. It is undisputed that Dr. Veit is a consulting physician, meaning he sees CCUSO patients only when contacted by CCUSO staff. Doc. No. 16-3 at 107. During the relevant period of time, Dr. Veit's only involvement was the administration of a cortisone injection to Williams' shoulder on March 19, 2014. Doc. No. 16-4 at 9. While Williams appears to suggest that Dr. Veit should have followed up to find out if Williams continued to suffer pain, there is no evidence that Williams sought such additional care or that Dr. Veit was notified of further issues with Williams' shoulder. Dr. Veit could not have been deliberately indifferent to medical needs that were not brought to his attention. On the current record, there is no argument that Dr. Veit's care was even below professional standards, let alone that it amounted to a constitutional deprivation.

In short, Williams has failed to produce evidence generating a genuine issue of material fact as to his deliberate indifference claims against Benson and Dr. Veit. Both defendants are entitled to summary judgment.

### B. *The Mail Claim*

Williams alleges (a) he has been denied mail contact with friends who are former CCUSO patients, (b) certain mail requests have been denied as counter-therapeutic with no further explanation, (c) that some of his mail has not been delivered even though he has taken the appropriate steps and (d) CCUSO has unlawfully opened his mail outside his presence without his permission. Doc. No. 23-3 at 7-8. He seeks to hold Wittrock, CCUSO's Director of Security and Deputy Superintendent, liable for these alleged violations of his constitutional rights.

To the extent Williams seeks to change CCUSO's mail policy, he is prohibited from doing so. As noted above, Williams previously litigated the constitutionality of the mail policy as a class member in No. C05-4065. That action concluded with a settlement agreement that was accepted by Judge O'Brien. The agreement is binding on all parties

and the class members waived and released all claims raised in the complaints. Doc. No. 16-4 at 117. Because Williams was a class member to the settlement agreement he is bound by the agreement and cannot now relitigate the constitutionality of the mail policy itself. *See* Fed. R. Civ. P. 23. Instead, he would have actionable claims only to the extent CCUSO has taken actions that violate the policy.

The record contains no evidence that CCUSO has rejected mail in violation of its mail policy or otherwise has failed to comply with the previous settlement agreement. The policy provides that "[a]ll incoming and outgoing mail (not including legal mail) may be reviewed and searched at the discretion of the facility as outlined in this policy." Doc. No. 16-4 at 64. The policy further contemplates that CCUSO will consider both security and therapeutic concerns in determining whether to permit particular mail communications. *Id.* A grievance procedural is available to patients who wish to appeal particular decisions. *Id.* at 115.

None of Williams' allegations amount to violations of the mail policy. Even if CCUSO did, as he contends, improperly open a medical bill while he was in jail, an isolated incident does not give rise to a constitutional claim. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012); *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997). I find that Williams has failed to produce evidence generating a genuine issue of material fact as to his claim that CCUSO has violated his constitutional rights through its mail-handling practices.[3]

## C.   *The Phone Claim*

Williams alleges that the telephone policy at CCUSO is unconstitutional and seeks to hold Wittrock liable for the alleged, resulting deprivation of his rights. Specifically,

---

[3] Even without the prior settlement agreement, I would find CCUSO's mail policy constitutional pursuant to the four-factor analysis set forth in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). I will apply the *Turner* analysis to Williams' phone claim, *infra*.

he argues that CCUSO's new form for obtaining approval to add an individual to a patient's calling list is "unduly restrictive and not rationally related to any legitimate government interest." Doc. No. 23-3 at 8.

A civilly committed individual has a limited liberty interest in the use of the telephone under the First and Fourteenth Amendments. *See Jones v. Brown*, 461 F.3d 353, 358 (3d Cir. 2006), *cert. denied*, 549 U.S. 1286 (2007). The Eighth Circuit applies the *Turner* test to determine if a prison regulation is constitutional. *Beaulieu v. Ludman*, 690 F.3d 1017, 1039 (8th Cir. 2012). This test asks:

> (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at de minimis cost to the valid penological interest.

*Id*.[4] With regard to the first question, CCUSO has an interest in the safety of patients and the public as well as an interest in maintaining a therapeutic treatment environment for patients. Safety and a therapeutic treatment environment are legitimate interests. *See Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993). The Eighth Circuit has approved as rational both (a) a phone policy that does not allow incoming calls and (b) a policy that restricts calls to a preapproved list of three people. *See Beaulieu*, 690 F.3d at 1037-41; *Benzel v. Grammer*, 869 F.2d 1105, 1108-09 (8th Cir. 1989). Restricting phone calls to individuals on a preapproved list is a rational way to maintain security and a therapeutic environment.

---

[4] As a civilly-committed individual, the term "penological interest" does not directly apply to Williams. As such, I will apply the modified *Turner* test *utilized* by Judge Mark W. Bennett, substituting *"therapeutic interests as well as relevant safety and security concerns"* in place of *"penological interests." Scott v. Benson*, ___ F.3d ___, 2015 WL 9239894, at *10 n.14 (N.D. Iowa Dec. 17, 2015) (quoting *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014)).

The second question is whether there are alternate means for Williams to exercise his First Amendment rights. The CCUSO telephone policy does not deprive patients of all means of exercising their First Amendment rights. The telephone policy merely restricts access to the telephone to a preapproved list of numbers. Williams himself testified that he was never prohibited from calling a business after he had filed the appropriate form. Doc. No. 16-3 at 66. Additionally, patients at CCUSO are able to send and receive permitted mail and to have in-person visits as alternatives to using the telephone. The alternatives do not have to be ideal, they just have to be available. *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003).

The third consideration is the effect accommodation of the asserted rights would have on others. Williams effectively contends that he should receive different treatment because he does not abuse his telephone privileges, unlike some other patients. Doc. No. 16-3 at 53, 67. However, granting a waiver to Williams would almost certainly have a negative effect on the current system. Currently, patients must submit forms listing who they want be added to their approved calling lists. CCUSO then vets the proposed contacts and either approves or denies each request. The use of a standard form to add a person to the list of approved callers is an appropriate way for the staff at CCUSO to obtain the necessary information. Without using a standard form, CCUSO staff would have to spend time gathering the necessary information on an *ad hoc* basis. Williams has presented no rational reason as to why the defendants should carve out a special exception for him.

The last question is whether an alternative regulation could fully accommodate the patient's rights without sacrificing the government's interests. Williams contends that CCUSO should simply reinstate the prior form. However, he offers no specific evidence about what the older form required, only stating that it was less restrictive. The Eighth Circuit has held that "federal courts owe great deference to the expertise of the officials" *Benzel*, 869 F.2d at 1108. Having reviewed the current CCUSO form, I find nothing

17

that is so obviously intrusive or obnoxious as to override the deference to which Wittrock and other CCUSO officials are entitled. Thus, based on my analysis of the *Turner* factors, I find that CCUSO's telephone policy, including the standard form for adding individuals to a patient's approved-contact list, constitutes an appropriate institutional regulation that does not deprive CCUSO patients of their constitutional rights.

In addition to challenging the policy itself, Williams raises two specific instances in which he contends that the application of the policy violated his constitutional rights. First, as set out above, Williams was denied the ability to call his Aunt Paulette during a family emergency because she was not on his approved calling list. He ultimately had to wait approximately four days to place the call. It is undisputed, however, that CCUSO staff was merely following the policy when denying Williams' request to call someone not on his approved list. It is unfortunate that he could not contact his Aunt while his mother was ill. However, he has not explained why he was unable to use alternative methods to contact his family and obtain information about his mother. For example, were other family members already on his approved telephone contact list? Could he have communicated by mail and/or by in-person visits?

Inherent in the notion of civil commitment is the assumption that the patients are cut-off from some contact with the outside world. Civil commitment, segregating these patients from the rest of society, is constitutional as a general principal. See *Kansas v. Hendricks*, 521 U.S. 346 (1997). As discussed above, it is entirely appropriate for CCUSO to maintain an approved contact list for each patient and to vet proposed new contacts before allowing telephone calls to occur. It was not unreasonable for CCUSO to require information about Aunt Paulette as a condition of approving her. This incident did not amount to a deprivation of Williams' constitutional rights.

Williams' other complaint about the policy, as applied, is that he is not permitted to contact certain former CCUSO patients. His desire to contact these patients is understandable, as they likely became acquaintances during their time together at

CCUSO. Again, however, it is not the court's role to micromanage CCUSO's administration of its policies or second-guess its balancing of competing interests. The telephone policy states that a patient may receive approval to contact previous patients on a case-by-case basis. Doc. No. 16-4 at 63. Williams has received permission to contact one previous patient (Kenny), but has been denied the permission to contact other former patients (Briggs, Etie, Hoffert and Hollins). Williams testified that he understood why he could not call Hollins. Doc. No. 16-3 at 57. He also agrees it is "entirely possible" that a previous patient would have "offense-supportive" attitudes, which he described as attitudes "supportive of offending, demeaning women, demeaning children, believing that they're okay to have as sex objects and so forth." *Id.* at 55-56. I find that CCUSO's determination that Williams should not have telephone contacts with certain former patients does not amount to a deprivation of Williams' constitutional rights.[5]

## VI. CONCLUSION

For the reasons set forth herein, defendants' motion (Doc. No. 16) for summary judgment is **granted** with regard to all claims in these consolidated cases. Both actions are hereby **dismissed with prejudice**. Judgment shall enter against the plaintiff in both cases.

---

[5] Because Williams has failed, as a matter of law, to show any deprivation of his constitutional rights, I need not address defendants' alternative arguments concerning qualified immunity and Eleventh Amendment immunity.

**IT IS SO ORDERED.**

**DATED** this 29th day of June, 2016.

                                                _____
                                                LEONARD T. STRAND
                                                UNITED STATES DISTRICT JUDGE